# IN THE DISTRICT COURT OF THE UNITED STATES
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION

## CIVIL CASE NO. 3:05cv257

| | |
|---|---|
| CADMUS COMMUNICATIONS CORPORATION,  )<br>)<br>Plaintiff,  )<br>)<br>vs.  )<br>)<br>JACKIE L. GOLDMAN, f/k/a  )<br>JACKIE PETET d/b/a  )<br>SCREAMING FISH LLC and  )<br>SCREAMING FISH LLC,  )<br>)<br>Defendants.  )<br>_____) | **MEMORANDUM OF DECISION** |

**THIS MATTER** is before the Court on the Plaintiff's motion for partial summary judgment regarding the Defendant's counterclaim.

## PROCEDURAL HISTORY

Cadmus Communications Corporation (Cadmus) filed this action on June 2, 2005 seeking a declaratory judgment that it does not owe any debt to Jackie Goldman (Goldman) or her company, Screaming Fish LLC

1

(Screaming Fish) in connection with a contract Cadmus entered into with Cox Communications Corporation (Cox) at a time when Goldman acted as an independent contractor for Cox.  Cadmus alleges that after it had been awarded a contract with Cox for printing, Goldman demanded a "kickback" or bribe in the amount of approximately $137,000.  When Cadmus inquired about Goldman's demands for payment, Cox terminated its relationship with Goldman and advised Cadmus not to make payment of the sums demanded by her.  Cadmus asserts the following claims against Goldman: (1) unfair and deceptive trade practices; and (2) declaratory judgment that Cadmus does not owe any sums to Goldman and that her demands for payment violate the Robinson Patman Act and the North Carolina Unfair and Deceptive Trade Practices Act.

On July 25, 2005, Goldman filed an answer with a counterclaim for breach of contract based on an agreement of September 2001 "wherein Defendants[1] would work on certain kits, specifically the Self Reliance Conversion kit and Cox Digital Cable IPG Swap-Out kit, handling production, designing their kits, and sourcing of the kits for which [the

---

[1] Defendants now concede that this allegation is incorrect because Defendant Screaming Fish, LLC was not formed until June 2002. Statement of Facts filed by Defendants, January 5, 2007, at ¶2.

Defendants] would receive a commission for each kit produced by the Plaintiff." Answer with Counterclaim, filed July 25, 2005, at 5. In a second "counterclaim," Goldman alleged that Cadmus "has acted in bad faith, has been stubbornly litigious and has caused the Defendants unnecessary trouble and expense." Id., at 6. As a result, the Defendants seek attorneys' fees. Id. This claim is not actually a counterclaim but would properly be described as a request for an award of attorneys' fees.

In its response to the counterclaim, Cadmus asserted the affirmative defense of the statute of limitations. Plaintiff's Response to Counterclaim, filed August 17, 2005, at 1.

On December 15, 2006, Cadmus moved for summary judgment as to the counterclaims. No other dispositive motions were filed and the deadline for such filings has passed.

## STANDARD OF REVIEW

> Under the Federal Rules of Civil Procedure, summary judgment shall be awarded "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, ... show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." As the Supreme Court has observed, "this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the

requirement is that there be no *genuine* issue of *material* fact." Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 519 (4th Cir. 2003), cert. denied, 541 U.S. 1042 (2004) (emphasis in original).  A genuine issue exists if a reasonable jury considering the evidence could return a verdict for the nonmoving party.  Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994), cert. denied,  513 U.S. 813, 814 (1994)*,* (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact."  Bouchat, 346 F.3d at 522 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).  If this showing is made, the burden then shifts to the non-moving party who must convince the Court that a triable issue does exist.  Id.

> A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denial of [his] pleadings," but rather must "set forth specific facts showing that there is a genuine issue for trial."  Furthermore, neither "[u]nsupported speculation," nor evidence that is "merely colorable" or "not significantly probative," will suffice to defeat a motion for summary judgment; rather, if the adverse party fails to bring forth facts showing that "reasonable minds could differ" on a material point, then, regardless of "[a]ny proof or evidentiary requirements imposed by the substantive law," "summary judgment, if appropriate, shall be entered."

4

Id.

Moreover, in considering the facts for the purposes of this motion, the Court will view the pleadings and material presented in the light most favorable to the nonmoving party. Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574 (1986).

The Plaintiff's first ground for summary judgment is that the Defendant's counterclaim is barred by the statute of limitations. "Whether a cause of action is barred by the statute of limitations is a mixed question of law and fact. Ordinarily it will be for the jury. Where the facts are admitted or established, the question becomes one of law for the court." Georgia-Pacific Corp. v. Bondurant, 81 N.C. App. 362, 364, 344 S.E.2d 302 (1986).

As a matter of law, counterclaims do not relate back to the date on which the Plaintiff's action was filed.[2] Pharmaresearch Corp. v. Mash, 163 N.C.App. 419, 427, 594 S.E.2d 148 (2004), review denied 358 N.C. 733,

---

[2] No issue has been raised as to whether the Plaintiff's filing of the Complaint on June 2, 2005, seeking a declaratory judgment that it has no liability to the Defendants on the claimed contract tolled the statute of limitations. The difference between the filing dates of the Complaint and the Counterclaims is not germane to the reasoning herein. If the Defendant's claimed cause of action accrued at any time prior to June 2, 2002, then the Counterclaim is barred whether or not there was a tolling.

601 S.E.2d 858 (2004), (citing State Farm Fire & Cas. Co. v. Darsie, 161 N.C.App. 542, 589 S.E.2d 391 (2003), review denied 358 N.C. 241, 594 N.C. 194 (2004)).  The question before this Court on this Motion then becomes one of whether the counterclaims were timely filed on July 25, 2005.

## FACTS CONCERNING THE COUNTERCLAIM

The following are the facts taken in the light most favorable to the non-moving party (Defendants), or which have been conceded by the Defendants.

Goldman alleges in her counterclaim that in September 2001, she entered into "an agreement" with Cadmus pursuant to which she would work on the Self Reliance Conversion and Cox Digital Cable IPG Swap-Out kits handling the design, production, and sourcing of the kits.  In return, Goldman claims she was to receive a "commission" for each kit produced by Cadmus.

Cadmus, on the other hand, denies that such a contract existed and alleges that it had a contract with Cox, not Goldman, and that Goldman's contractual relationship, if any, was with Cox.

In opposition to the motion for summary judgment, Goldman has filed a "Statement of Facts" in which she admits certain facts with citation to the record. In addition, Goldman has filed an affidavit and the parties have filed exhibits. Unless otherwise noted, the parties are in agreement as to the following facts.

1. Goldman was retained by *Cox* as an independent contractor. Statement of Facts, filed January 5, 2007, at ¶3 (emphasis provided).

2. In addition to Goldman's admission that her contractual relationship was with Cox, she also admits that she did not have a written agreement with Cox. Id. at ¶4.

3. Goldman provided "services as an independent contractor, ... *to Cox, her client*, in November 2000 until early April 2002." Id. at ¶9 (emphasis provided).

4. In January 2002, Goldman advised a Cox employee that in the future, she would include her costs as part of the cost for the kits. Id. at ¶¶22-23. But, Goldman did not disclose what her costs were to Cox. Id. at ¶24. Cadmus takes no position on this issue.

5. On January 21, 2002, Goldman sent Cadmus two invoices for the kits at issue. Exhibit 7, attached to Appendix to Plaintiff's Brief in

Support of Motion for Summary Judgment; Statement of Facts, supra, at ¶¶58, 61. The invoices were for $69,790.96 and $68,000.00 respectively. Id.; Exhibit 7, supra. The invoices show that Goldman billed Cadmus $0.08 per kit and that her invoices were due "Net: 15 days." Id. Thus, payment would have been due on February 5, 2002.

6. On April 1, 2002, Goldman was contacted by David Butler, chief financial officer of Cadmus, by email about invoices she had submitted to Cadmus. Statement of Facts, supra, at ¶37; Exhibit 9, attached to Appendix to Plaintiff's Brief in Support of Motion for Summary Judgment, supra.[3] In the email from Butler to Goldman, Butler stated as follows:

> Jackie, both Cathy Newsome and I have now talked to you several times about the invoices you sent to Allen Vaughn a few weeks ago and ... about your request for payments to be made to you personally[.] We did not know about the invoices until last Wednesday afternoon, when I found them in Allen's files while looking for something else. We are very concerned about the entire situation, and *I am sending this email so there is no confusion about Cadmus' position, which is as follows:*
>     *1. Cadmus did not authorize Allen Vaughn to agree to make any payments to you personally and we find it*

---

[3]These emails were identified during Goldman's deposition as Exhibit 9.

8

> *highly unusual and troubling that, as Cox's agent, you would be submitting personal invoices to Cadmus. ...*
> 2. Until we have obtained instructions and/or clarifications from Cox, we would prefer not to communicate with you further about the outstanding Cadmus invoices.
> 3. *We cannot agree to make payments to you personally with respect to future Cox business until Cox authorizes such payments and we have a full understanding of the situation and conclude that such payments are legally permissible.*

Exhibit 9, *supra*; (emphasis provided).

Goldman forwarded Butler's email to Dena Malsom, a Cox employee. Statement of Facts, *supra*. Goldman acknowledges that on this date, April 1, 2002, she was aware of "the issue about her compensation." Id.

7. Goldman also admits that on April 1, 2002, she responded to Butler's email and advised him that she was not an employee of Cox and did "not have a contract with Cox outlining my role, compensation, or relationships with other suppliers" Id. at ¶56.[4] In that email, Goldman made the following statements:

> My compensation plan is a personal matter, as is your profit margins. Please note - *Cox Communications is my customer*,

---

[4] In her Statement of Facts and elsewhere in that same e-mail, however, Goldman does admit that she was a contractor of Cox's. Id. at ¶3.

9

and my first goal is to take care of their requirements.

...

*If you chose not to honor the agreement had with Allen*, ... I can respect that. *I simply wish I had known this sooner* since I had made financial commitments towards my father-in-law's health care. ... I would like to point out, that if you are not going to honor the invoices for brokerage fees, as submitted to your agent Allen Vaughn, *then the funds should at least be returned to Cox.*

Exhibit 9, supra. (emphasis provided).

8. Goldman states that April 3, 2002 was the last date on which she performed any work for Cox because she was warned "not to contact any supplier" that had done business with Cox and not to contact any Cox employee. Statement of Facts, supra, at ¶57.

9. Between April 2002 and September 2003, when Goldman's attorney wrote to Cadmus, she did nothing to collect this money from Cadmus. Exhibit 1, Excerpts from Deposition of Jackie Goldman, attached to Plaintiff's Appendix, supra, at 59-62. However, during the same time period, Goldman did pursue payment from Cox to her. Id. "Cox said, we'll pay you, give us all the information; and then they didn't pay me." Id.

10. Goldman filed an affidavit in which she testified:

Although questions were raised about the two invoices, it was

> not until sometime after September 10, 2003 that Affiant *definitively* learned that the Plaintiff was not going to pay her as agreed. Plaintiff had not unconditionally refused to pay Affiant until after September 10, 2003. (Emphasis added).
>
> Exhibit 16, attached to Defendant's Memorandum in Response, filed January 5, 2007, at ¶¶18, 19.

11. Goldman filed her counterclaims on July 25, 2005.

## DISCUSSION

The statute of limitations for an action for breach of contract is three years from the date of breach. N.C. Gen. Stat. §1-52(1).

Assuming *arguendo* that Goldman could establish the elements of a contract with Cadmus, at issue is the date on which any claim for breach of such a contract accrued. If such accrual occurred prior to July 25, 2002, then this claim is barred. "It is a well-settled rule in North Carolina that a cause of action for breach of contract accrues, and the statute of limitations period begins to run, '[a]s soon as the injury becomes apparent to the claimant or should reasonably become apparent[.]'" ABL Plumbing and Heating Corp. v. Bladen County Bd. of Ed., 175 N.C. App. 164, 168, 623 S.E.2d 57 (2005), review denied 360 N.C. 362, 629 S.E.2d 846 (2006), (citing Liptrap v. City of High Point, 128 N.C. App. 353, 355, 496 S.E.2d

817 (1998), review denied 348 N.C. 73, 505 N.C. 873 (1998)).

Goldman issued to Plaintiff the invoices in question in this case on January 21, 2002. They called for payment within fifteen days; hence payment was due on February 5, 2002. When payment had not been received by that date it should reasonably have been apparent to Goldman that timely payment was not forthcoming.

Goldman acknowledges that she was aware Cadmus was disputing liability in April 2002. In fact, at that time the Plaintiff denied the existence of a contract between Cadmus and Goldman. Butler sent his April 1, 2002, email "so there is no confusion about Cadmus' position" that it did not owe Goldman any money. He unequivocally states that "Cadmus did not authorize Allen Vaughn to agree to make any payments to your personally and we find it highly unusual and troubling that, as Cox's agent, you would be submitting personal invoices to Cadmus."

Indeed, in her responsive email to Butler, also dated April 1, 2002, Goldman acknowledged that Cadmus had "chose[n]" not to pay her, but she "simply wished [she] had known this sooner" due to financial

12

commitments made to her father-in-law.[5] In addition, Goldman admitted that after the email exchange, she did not pursue payment from Cadmus. Instead she attempted to obtain payment from Cox.

Despite these admissions, Goldman now argues that the limitations period did not begin to run until Cadmus had "definitively" communicated to Goldman that it would not pay in September 2003 after she had retained an attorney. "The correspondence of [Cadmus'] counsel of September 10, 2003 was the first time Goldman definitively learned that the Plaintiff was not going to pay her, and this is the first notice that [Cadmus] was taking this position." Statement of Facts, supra, at ¶103; accord, Exhibit 17, supra. ("[I]t was not until sometime after September 10, 2003 that Affiant definitively learned that the Plaintiff was not going to pay her[.]"). Goldman cites to no authority for the proposition that the limitations period does not begin to run until one party "definitively" denies liability. If the Court were to adopt such a position it would entail a substantial revision of the law.

The one case upon which Goldman relies regarding a later accrual of

---

[5]The Court concludes that the use of the past tense "chose" reflects an acknowledgment by Goldman that as of April 2002, she was aware that Cadmus had already made the choice to dispute the claim and would not pay it.

her cause of action is an unpublished case of the North Carolina Court of Appeals, <u>Magaldi v. Belverd</u>, 162 N.C. App. 547, 591 S.E.2d 598 (table) 2004 WL 192990, COA03-113 (2004).  Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure state that "An unpublished decision of the North Carolina Court of Appeals does not constitute controlling legal authority.  Accordingly, citation of unpublished opinions in briefs, memoranda, and oral arguments in the trial and appellate divisions is disfavored."  Even if the opinion in <u>Magaldi</u> were published, however, it would be of little benefit to the Defendant.  In <u>Magaldi</u> the plaintiff was a designer who had performed services for the defendants.  During plaintiff's work she had issued three invoices to the defendants, and then issued a fourth when work was terminated.  The first invoice was paid; the second and third were not, but plaintiff continued performing the design work for defendants.  When the defendants terminated the plaintiff's contract, a fourth invoice was issued, and only then did the defendants refuse payment.  The Court of Appeals held that the designer's continuation of work while the second and third invoices remained unpaid reflected a "waiver" by the designer, and thus the defendants' failure to pay did not constitute a breach of the agreement.  In the present case, Goldman

issued the invoices in January 2002, and did no further work with Cadmus after that date. On April 1, 2002, Cadmus advised Goldman "we would prefer not to communicate with you further." There is no evidence in the record before this Court to which Goldman can point by which Cadmus was excused from paying the invoices on or before February 5, 2002, as the invoices themselves dictated. The rule of Magaldi (if a non-precedential case has a "rule") is completely inapplicable to the present case.

Moreover, the factual basis for Goldman's argument that Cadmus had not "definitively" denied liability until September 2003, as set forth in her statement of facts and affidavit submitted in opposition to the motion for summary judgment, directly contradicts the contents of her email to Butler, her deposition testimony and other portions of her statement of facts. "[A] party against whom summary judgment is sought cannot create a jury issue by identifying discrepancies in [her] own account of the facts." Spriggs v. Diamond Auto Glass, 242 F.3d 179, 186 n.7 (4th Cir. 2001), (citing Rohrbough v. Wyeth Laboratories, Inc., 916 F.2d 970 (4th Cir. 1990)); Hernandez v. Trawler Miss Vertie Mae, 187 F.3d 432, 438 (4th Cir. 1999). Notwithstanding this contradiction in Goldman's position, her own

15

admission and documents show that as of April 1, 2002, it was apparent to her, or reasonably should have been apparent, that Cadmus was denying liability. There is no genuine issue of material fact as to this point and Goldman's argument that she did not "definitively" know until 2003 is rejected as a self-serving statement made after the initiation of litigation and in opposition to summary judgment. Ramsey Group, Inc. v. EGS Intern., Inc., 329 F. Supp. 2d 630, 637 (W.D.N.C. 2004) (holding that an affidavit or declaration which contradicts prior sworn testimony may be stricken and does not create a genuine issue of material fact.).

Though Goldman has not raised the issue of *quantum meruit*, she does refer to the services she performed. Even if this calim were couched in such terms it would still be barred by the statute of limitations. The limitations period for *quantum meruit* is three years just as it is for contract. N.C. Gen.Stat. §1-52(1); In re Estate of English, 83 N.C. App. 359, 350 S.E.2d 379 (1986), review denied 319 N.C. 403, 354 S.E.2d 711 (1987). In an action for *quantum meruit*, the cause accrues at the time the service is last provided. Id. It is undisputed that the services for which Goldman seeks payment were provided prior to the January 2002 invoices. Goldman admits that as of April 2002, she did not provide any additional

services to Cox. Hicks v. Hicks, 13 N.C. App. 347, 185 S.E.2d 430 (1971); see also, Duke University v. Stainback, 84 N.C. App. 75, 351 S.E.2d 806 (1987), affirmed 320 N.C. 337, 357 S.E.2d 690 (1987) (holding that there must be facts to support estoppel to prevent defendant from asserting statute of limitations). Thus, whether Goldman's claim arises pursuant to contract or *quantum meruit*, her counterclaim filed on July 25, 2005 is barred by the statute of limitations.

"Where the facts are admitted or established, the question [of the statute of limitations] becomes one of law for the court. The courts have generally applied this latter rule to allow the trial court to summarily dispose of stale claims." Georgia-Pacific Corp. v. Bondurant, 81 N.C. App. at 364, 344 S.E.2d 302. "[W]here the statute of limitations is properly pled and the facts are not in conflict, the issue becomes a matter of law, and summary judgment is appropriate." Rowell v. North Carolina Equipment Co., 146 N.C. App. 431, 434, 552 S.E.2d 274 (2001). Such is the case here and the Court grants summary judgment to the Plaintiff dismissing the Defendants' counterclaim(s).

In light of the Court's ruling that the Defendants' claim is barred by the statute of limitations, the Court does not reach the issue of whether the

Defendants are seeking to enforce an illegal contract. It appears to the Court, however, that the Robinson-Patman Act, 15 U.S.C. §13(c) and N.C. Gen. Stat. §14-353 prohibit any payment in a commercial transaction by one party to that transaction to the agent of a different party thereto. In her evidence, Goldman concedes that she was an independent contractor for Cox, and that Cox was her "customer." Exhibit 9, supra. Clearly, Cox and Cadmus were parties to a commercial transaction, and Goldman seeks by this action to recover the payment of what she claims to be a commission for her services in that transaction. Defendants make no cogent argument as to how such a contract, if it existed, was lawful.

By this Order, the Court disposes of the issue of whether the Plaintiff is liable to the Defendants for the payments due on the two January 2002 invoices. Since the claimed liability on those invoices is also the subject of the Plaintiff's claim for declaratory relief, this Order likewise disposes of that issue, and Judgment on that claim will be entered accordingly.

Defendants' second counterclaim is actually a motion seeking attorneys fees. Attorneys fees are rarely recoverable by successful parties in litigation, and Defendants cite to no authority that would allow the recovery of such fees to an unsuccessful litigant. As such, summary

judgment is also appropriate regarding the Defendants' second counterclaim.

## ORDER

**IT IS, THEREFORE, ORDERED** that the Plaintiff's motion for partial summary judgment is hereby **GRANTED** and the Defendants' counterclaim(s) and request for an award of attorneys' fees and costs are hereby **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that the Defendants' counterclaim(s) having been dismissed, the Plaintiff is entitled to **DECLARATORY JUDGMENT** that the Plaintiff does not owe any debt to the Defendants in connection with the contract at issue in this litigation.

**IT IS FURTHER ORDERED** that declaratory judgment that the Defendants' demands for payment violate the Robinson Patman Act and the North Carolina Unfair and Deceptive Trade Practices Act need not be reached and the Plaintiff's motion for summary judgment as to those claims is hereby **DENIED WITHOUT PREJUDICE**.

**IT IS FURTHER ORDERED** that the Plaintiff shall advise the Court in writing not to exceed two double-spaced pages in size 14 font on or before January 17, 2008, (two weeks before the scheduled final pre-trial

conference) whether it intends to proceed to trial on its remaining cause of action for unfair and deceptive trade practices.

Signed: December 10, 2007

Martin Reidinger
United States District Judge